# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00102-CR

**Jimmy Wayne Tharp, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 51ST DISTRICT COURT OF IRION COUNTY
### NO. CR22-003, THE HONORABLE CARMEN DUSEK, JUDGE PRESIDING

## O P I N I O N

Jimmy Wayne Tharp was convicted of indecency with a child by contact for a charge pertaining to his daughter C.T.[1] and was sentenced to ten years' imprisonment. *See* Tex. Penal Code §§ 12.33, 21.11(a)(1). In three issues on appeal, Tharp contends that the trial court erred by not allowing him to cross-examine C.T. about prior allegations, allowing the State's witness to vouch for C.T.'s veracity, and by imposing court costs that were not authorized. We will modify the trial court's judgment of conviction and affirm the trial court's judgment as modified.

---

[1] Because C.T. was a minor when the offense occurred, we will refer to her by her initials and to her family members other than Tharp by their relationships to her. *See* Tex. R. App. P. 9.10(a)(3).

## BACKGROUND

In 2004, Mother married Tharp in Connecticut and subsequently had two children: C.T. and her younger brother. Mother also had two older daughters from a previous relationship. In 2009, Mother, Tharp, C.T., and her younger brother moved to a ranch in Texas. After a year and a half, the family moved from the ranch to a nearby town, and Mother's older daughters came to live with the family as well. The family worked on building a home on their property, which the family referred to as the yellow house. The family lived in a camper during the construction. While the family lived in the camper, Tharp built an outdoor bathing area for the family to use. The family finished building the yellow house and moved into the home when C.T. was seven. The family lived in the house for two years before moving into another house in the town that the family called the green house. The family lived in the green house for three years.

Next, the family moved to New Mexico in 2017 when C.T. was twelve years old after Tharp and Mother were hired to be ministers in an organization that provided help to single mothers. While working in New Mexico, Tharp became romantically involved with one of the mothers receiving services and moved in with her. Approximately seven months after moving to New Mexico, Mother and her children moved back to Texas. Subsequently, Tharp also moved back to Texas where Mother and he got divorced.

In 2021, when driving home from a trip approximately three years after the divorce, Mother began telling C.T. how Tharp had potential to be a successful person. During the conversation, C.T. disclosed that Tharp used to make her touch him in the outdoor and indoor showers while they lived at the yellow house. Mother decided not to report the outcry to the police after talking with her church counselor. Approximately a week after the outcry, one of

2

C.T.'s friends noticed C.T. crying and asked C.T. what was wrong, and C.T. told her friend that she had been assaulted by a person while walking home from school. The friend told a school counselor, and the school counselor contacted the Department of Family and Protective Services ("Department"). The Department then informed the police, and Detective Rebecca Stuart went to C.T.'s school to talk with her. When Detective Stuart approached C.T., C.T. stated that she knew why the officer was there but informed the officer that she had not been truthful with her friend about the incident. More specifically, C.T. explained that she told her friend about an incident that had occurred a year beforehand but told her friend that the incident had just occurred because she did not want to discuss what was actually troubling her and had made her cry. During her conversation with Detective Stuart, C.T. disclosed that something sexual occurred between Tharp and her, and a forensic interview was scheduled for C.T. Around this time, Mother arranged for C.T. to see a counselor.

Following the disclosure about Tharp, the police began investigating the allegations, and Tharp was later charged with indecency with a child. During the trial, the State called as witnesses C.T., Mother, Detective Stuart, another officer involved in the investigation, C.T.'s two older sisters, and C.T.'s counselor. In his case-in-chief, Tharp called his brother, C.T.'s younger brother, C.T.'s cousin, and two work associates.

In her testimony, C.T. explained that Tharp would be naked in their houses even when around the children and that Tharp regularly showered with her a few times a week when they lived at the yellow house; however, C.T. admitted that she told the forensic interviewer that she did not shower with Tharp that often and usually showered with Mother. Regarding the showers, C.T. recalled that Tharp would place her hand on his penis while they were in the shower, make her move her hand "back and forth until he got hard," and make her "jack him off"

3

until liquid came out of his penis. Further, C.T. stated that the incidents stopped when the family moved to the green house after she turned eleven and started showering on her own. Moreover, C.T. related that Tharp also spit on her and her siblings.

In addition to these incidents, C.T. testified that after making her outcry, she began remembering other incidents of abuse that occurred at the yellow house and at the ranch where the family lived before moving to the yellow house. Regarding incidents that occurred at the ranch, she stated that Tharp would enter the bedroom that she shared with her brother, that Tharp would remove her blanket, and that he would touch her. When discussing these incidents, C.T. admitted that she did not remember specific details about the abuse and admitted that she initially mistook her father for a monster in her room but realized the monster was actually her father during her discussions with her counselor. Further, C.T. admitted that she had no "exact memories" of any inappropriate touching at the ranch, did not know for certain that Tharp touched her, and had been "basically" assuming that he had touched her. Regarding other incidents at the yellow house, C.T. testified that Tharp directed her to touch herself while they were both naked and would emphasize sex scenes when they watched R-rated movies together.

In her testimony, C.T. admitted that she did not tell the forensic interviewer about any of the abuse other than what occurred in the shower because she did not remember the other incidents at the time of the interview and because she was not ready to tell everything that happened at the time of the interview; however, C.T. explained that she did tell her counselor about the other incidents later. When discussing why she did not make an outcry before, C.T. stated that it took her a while to realize that the incidents were wrong, that she was afraid no one would believe her, that she was fragile before she made the outcry, that she had been depressed for years before making the outcry, and that she could not have handled making the outcry

4

earlier. Moreover, C.T. acknowledged that Detective Stuart initially contacted her because of a lie that she told her friend about an incident that had occurred a year prior, that she did not want to submit to a forensic interview, that she was forced to go to the interview, and that this case "took on its own legs" without her having a choice in the matter. Next, C.T. testified that a few months after her outcry, she discussed the abuse at a church youth retreat in front of her younger brother but did not recall disclosing when the abuse occurred.

Additionally, C.T. detailed that she had started a new high school before her outcry and had made new friends with a few of the female students, including one whose father abused the friend. Although C.T. agreed that disclosing the abuse to her new friends might have helped her fit in with the friend group, she also explained that the abuse she suffered was different from the abuse inflicted on her friend and denied discussing the abuse with her new friends.

Concerning the events leading up to her parents' divorce, C.T. testified that Tharp had an affair while they lived in New Mexico, left the family, and put the family in dire financial straits. C.T. admitted that she was angry at Tharp for having the affair and hurting her family, that she did not want to be around Tharp and his girlfriend, and that she told her counselor that the affair and divorce caused her a lot of pain. Additionally, C.T. testified that Mother was angry at Tharp for his actions, would discuss how she was upset about the divorce, would talk about Tharp a lot, related after the divorce that Tharp lost all the family's money, and stated that Tharp was unable to control his sexual impulses. However, C.T. clarified that she did not accuse Tharp of abusing her because he left Mother or because she wanted to get out of seeing him. Further, C.T. explained that she did not visit Tharp's home after her parents got divorced but would meet him for dinner, that Mother encouraged the children to visit with Tharp, and that if she did not

5

want to see Tharp, she could have just asked not to see him. Moreover, C.T. recalled that there was no precipitating event with Tharp before the outcry and that no sexual activity had occurred for several years before the outcry.

Following C.T.'s testimony, Mother testified that Tharp started showering with the children while the family lived in the camper and continued to shower with them when the family finished building the yellow house and moved in. Regarding the showers, Mother testified that Tharp would be naked when showering with the younger children. Although Mother knew that Tharp showered with the children before they lived in the yellow house and believed he did so at the yellow house, she admitted that she did not actually observe him shower with any of the children at the yellow house. In addition, Mother related that Tharp would walk around the house in his underwear or wear a robe with nothing on underneath and that Tharp would walk around naked in the bedroom in front of C.T and her brother when the children were young. Further, Mother discussed how C.T. began touching her genitals at a young age. Mother also recalled that Tharp told her that he showed one of her older daughters a magazine with sexual images in it to teach the child about sex, but Mother did not know what the images depicted.

When discussing the time the family lived in New Mexico, Mother testified that Tharp took all their savings when he left her for another woman and that she told the children that Tharp had an affair and took all their money. In addition, Mother explained that she told C.T. that Tharp had a sex addiction. In her testimony, Mother described her children as being hurt by Tharp's actions and stated that Tharp did not have a good relationship with the children before the divorce. Mother explained that following the divorce, she had primary custody of the children but allowed the children to see Tharp whenever Tharp and the children wanted;

however, Mother testified that the children did not want to be around Tharp's girlfriend. Although Mother admitted to being hurt by the divorce, she said that she eventually became grateful for the divorce, had peace in her home, and had a friendly relationship with Tharp prior to C.T.'s outcry. Additionally, Mother explained that neither C.T. nor she had been in an argument with Tharp before the outcry and denied giving C.T. the idea to claim that Tharp abused her. Given what she described as a peaceful home, Mother stated that she had been confused regarding why C.T. had been so depressed and anxious for years until C.T. made the outcry. Regarding the outcry, Mother testified that C.T. revealed that Tharp would make her touch him in the shower at the yellow house. Mother testified that she had never suspected that something like that had occurred and did not report the outcry to the police because she was worried that C.T. was too fragile to go through the process. Further, Mother testified that the report she filed with the police regarding the outcry detailed why Tharp was a bad person based on the prior choices he made pertaining to the family, and one of the investigating officers testified that the written report showed that Mother continued to be angry about the divorce from Tharp. Next, Mother revealed that C.T.'s younger brother decided to live with Tharp after C.T. made her outcry.

During her cross-examination, Mother stated that C.T. did not tell her that the abuse started when she was three years old. Additionally, Mother related that C.T. began making art with dark themes only after Tharp moved out and that C.T. did not become depressed until after Tharp had moved out. Mother also explained that before the week of the trial, C.T. never mentioned Tharp forcing her to masturbate or coming into her room at the ranch and touching her. Mother denied physically or verbally abusing C.T., but she admitted that she had spanked C.T. before, might have slapped her, did kick her one time on her bottom, talked down

7

to her, demeaned her, and said inappropriate things to her while in a bad mood. Regarding these incidents, Mother testified that she did not believe they could have caused the mental anguish that C.T. had been suffering. Additionally, Mother denied having any knowledge of C.T.'s older sisters abusing her physically or verbally but agreed it could have happened.

At trial, C.T.'s counselor discussed how child victims of sexual abuse by a relative can have low self-esteem and suicidal thoughts, may not display any different behavior despite the abuse to protect the family from being torn apart, and might not disclose the abuse for some time because they might not realize that anything abnormal had happened until they get older or might be afraid they will not be believed. When describing disclosures, the counselor described it as a process rather than a single event and related that it can take time. Concerning how abuse by a family member can start, the counselor related that a perpetrator might walk around the house with no clothing on or expose himself to the child before any touching occurred. Regarding C.T., the counselor testified that she discussed touching Tharp's penis and was able to disclose what happened over time. Additionally, the counselor described C.T. as suffering from anxiety, depression, and low self-esteem, which the counselor explained was consistent with sexual abuse. However, the counselor admitted that children can develop mental-health issues without being sexually abused. The counselor also revealed that C.T. discussed touching her genitals a lot and that children who are exposed to sexual behavior at an inappropriate age can become sexually curious and touch themselves without embarrassment.

During her cross-examination, the counselor discussed how she had conversations with Mother about the children's being upset about Tharp leaving the family and how C.T. had a high level of anger toward Tharp for having an affair. Further, the counselor recalled that C.T. never discussed Tharp touching her or watching her masturbate but did discuss how Tharp made

8

her pay attention to the sex scenes in movies that they watched. Additionally, the counselor testified that no one reported that C.T. had anxiety or depression when the abuse was occurring and that her notes document that C.T. began experiencing anxiety and other mental-health issues following her outcry. Moreover, the counselor related that C.T. felt as though many people had wronged her and adopted a "victim mentality." Although the counselor remembered C.T. describing an incident where she mistook Tharp as a monster when she was younger, the counselor expressed that C.T. did not mention any sexual conduct occurring during that encounter. The counselor characterized C.T. as being consistently angry at Tharp for breaking up her family. The counselor generally related that conflicts in a story can be a sign of lying but that she did not receive any conflicting information in this case. Finally, the counselor stated that a child can have anxiety about making a false claim, but the counselor also explained that a child can have anxiety from making a true claim because he or she has been vulnerable.

Detective Stuart related that she went to C.T.'s high school to talk to her after receiving a report regarding an incident involving C.T. in which C.T. revealed to a friend that a person sexually assaulted her when she was walking home. Further, Detective Stuart explained that the incident was reported to the Department. Regarding her discussion with C.T., Detective Stuart explained that C.T. admitted that the incident she told her friend about did not happen but told Detective Stuart that something similar had happened one year earlier, but C.T. did not describe any sexual contact occurring. Next, Detective Stuart mentioned that C.T. stated that she had been crying and upset about something else when her friend asked her what was wrong and that she did not want to tell her friend what was really bothering her. Further, Detective Stuart related that C.T. then made a disclosure about Tharp. Regarding the disclosure, Detective Stuart recalled that C.T. became emotional and uncomfortable when asked if she had been forced to

9

touch anyone but did not have a similar reaction when asked if anyone had touched her, and Detective Stuart stated that C.T. did not mention Tharp touching her. Additionally, Detective Stuart discussed how C.T. clarified that she had not had a disagreement with Tharp recently. In response to questioning during cross-examination, Detective Stuart testified that she did not believe that the allegations against Tharp were false and did not find the new allegation to be suspicious; however, Detective Stuart admitted it was possible that C.T. was trying to garner sympathy after having been caught lying about the previous allegation. Based on her interaction with C.T., Detective Stuart stated that she did not think C.T. would "be able to maintain a lie."

C.T.'s oldest sister testified that she is nine years older than C.T. and that C.T.'s other older sister is seven years older. Oldest Sister recalled that while she lived with the family on the property with the yellow house, Tharp would take showers with her and C.T.'s other sister. When describing the showers, Oldest Sister stated that she and the other sister would be naked and that Tharp would be wearing running shorts, but she stated that he never touched her or made her touch him. Oldest Sister also remembered Tharp showering with C.T. both with and without her younger brother and with C.T. being naked but stated that she was not present in the bathroom when this occurred and did not know if Tharp was naked. When describing Tharp's behavior around the house, Oldest Sister stated that he would just wear a bathrobe without anything underneath. Additionally, Oldest Sister recalled that when she was eleven years old and before she knew what sex was, Tharp showed her pornographic magazines in his truck and explained the images. When describing the approximately thirty images, Oldest Sister stated they were "very graphic" with "images of women with maybe three penises in her mouth, double penetration, things of that nature," and she recalled "vigorously shaking from shock and nerves." Oldest Sister admitted to not having a good relationship with Tharp before the divorce and to

10

having animosity toward Tharp after the divorce because he treated Mother poorly and caused financial hardships for the family after losing a lot of their money.

C.T.'s other older sister also testified regarding the time when she lived with Tharp and stated that Tharp showered with her a few times while he was wearing shorts. She mentioned that she did not see Tharp take showers with the younger children. Regarding Tharp's behavior in the house, she stated that he would walk around in a robe with nothing on underneath and would leave the robe half-opened, that he would be naked under the sheets in his bedroom when the children were in the room, and that he would give massages. Concerning one massage, she testified that while Tharp was wearing shorts but no shirt, he gave her a back massage that resulted in his massaging the sides of her chest. She described the massage as "strange." She admitted that the divorce led to some bitterness in the family, that everyone was upset that Tharp had an affair, that family members discussed what a bad person he was, and that the children sympathized and sided with Mother after the divorce. Older Sister testified that she never witnessed Mother physically abuse C.T., that neither she nor Oldest Sister abused C.T., and that Tharp never spit on anyone. Although Older Sister said she wanted to support C.T., Older Sister said that she did not have a grudge against Tharp and did not lie to support C.T.'s claims against Tharp.

During his case-in-chief, Tharp called his brother and two work associates who testified that Tharp was an honest and law-abiding citizen, had a reputation for being truthful and for following the law, and had a reputation for treating children in a good and moral way. C.T.'s younger brother testified that he did not remember anything unusual happening in the bedroom he shared with C.T. at the ranch and that he did not remember Tharp taking showers with any of the children at any of the houses where the family lived. Although Younger Brother recalled

11

Tharp wearing a robe around the house, he also remembered Tharp wearing underwear under the robe. Similarly, Younger Brother denied that Tharp walked around the house naked. Younger Brother discussed how his parents got divorced after the family moved to New Mexico, how Mother thought Tharp was having an affair, and how Mother was upset by the divorce and affair, remained upset, and said negative things about Tharp. Additionally, Younger Brother related that Mother did not want him staying with Tharp because the woman with whom Tharp had an affair moved in with him.

Regarding the allegations, Younger Brother related that he first learned of the allegations when he was taken to a forensic interview, that he did not learn any specifics, and that Mother never talked about the allegations again. Next, he recalled that C.T. discussed the allegations at a church retreat and said that the abuse happened between the ages of seven and fourteen. Further, he testified that he did not believe the allegations because Tharp moved out of the house when C.T. was thirteen and that he moved in with Tharp because he did not believe C.T. and no longer had a good relationship with her.

Following this testimony, C.T.'s cousin was called to the stand and testified that he was in the same grade as C.T. and attended the same high school. Further, he related that he introduced C.T. to two female classmates, that C.T. and the two students became friends, and that he subsequently learned that one of the friends had been abused by her father. Additionally, he recalled that C.T. was jealous of Tharp's new family, felt replaced, and communicated this frustration before making her outcry.

Finally, Tharp called one of C.T.'s former teachers who testified that C.T. was not an honest person.

After considering the evidence presented at trial, the jury found Tharp guilty of indecency with a child by contact.

## DISCUSSION

**Cross-examination of C.T.**

In his first issue on appeal, Tharp argues that the trial court erred by prohibiting him from cross-examining "C.T. about prior false and incredible allegations of abuse."

Prior to trial, the State filed a motion in limine asking the trial court to instruct the defendant not to refer to evidence of specific instances of conduct of the victim's past sexual behavior and regarding prior conduct by other parties that the child disclosed during the forensic interview and said made her uncomfortable. In response, Tharp prepared a bench brief regarding C.T.'s allegations against other people that he characterized as false and asserted that he wanted to introduce evidence regarding those allegations at trial. The motion and Tharp's response were discussed during a hearing prior to any witnesses being called, and the trial court granted the motion in limine.

At the end of C.T.'s testimony, Tharp made an offer of proof regarding the evidence that he would have introduced concerning other allegations by C.T. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (stating that typically ruling on motion in limine does not preserve claims for appellate review); *see also* Tex. R. Evid. 103(a)(2), (c) (noting that to preserve error regarding excluded evidence, offering party may make offer of proof); *Hambrick v. State*, 11 S.W.3d 241, 243 n.1 (Tex. App.—Texarkana 1999, no pet.) (same). Specifically, he questioned C.T. outside the presence of the jury regarding other allegations, and C.T. testified to the following:

13

C.T. told the forensic interviewer that there was an eighteen-year-old camp counselor who was three years older than her and who grabbed her butt at a church camp in a sexual manner after they went tubing;

C.T. testified regarding the information that she told her friend that led to Detective Stuart's involvement in this case. Specifically, she denied telling her friend that a man grabbed her and raped her on the way home from school and instead explained that she told her friend that a man tried to grab her while she was walking home but that she got away. Further, she related that she told her friend the story after her friend saw her crying and that she did not want to discuss what was really bothering her, which was the outcry regarding Tharp that she had recently made to Mother. C.T. stated that the incident with the man was true but that it happened a while ago;

C.T. made an allegation against her high school Geography teacher and accused him of staring at her breasts and vagina and of putting his foot on a chair in front of the entire class and telling her "You know you want it." C.T. explained that she told her principal and that she was moved out of the class. Further, C.T. testified that she was aware that one of her friends who was present said that the teacher did not make those comments but was unaware that another one of her friends also denied that the comments were made. Additionally, C.T. stated that she was aware that no disciplinary action was taken against the teacher;

C.T. accused her stepsister, who was one or two years younger than her, of touching her breasts, butt, and vagina. C.T. testified that she was aware that the claim was never investigated;

C.T. admitted that she told her counselor that her sisters and Mother "sometimes took out things on [her] verbally and that [Mother] would punish me sometimes for no reason just because of the stress she was under" caused by Tharp. C.T. also testified that her sisters would get angry and kick or slap her and that Mother had gotten upset before and slapped her. Further, C.T. stated that in those times, she felt verbally and physically abused;

C.T. testified that multiple boys harassed her at school. Regarding one incident, C.T. explained that one boy her age put his hands on her breasts. Regarding another incident, C.T. related that another boy looked at her breasts and vagina during the school year and dropped a condom in front of her. Discussing another incident, C.T. stated that a boy tickled her and then later cornered her and put his hands on her throat, and she said that she reported the incident to her coach and the principal;

C.T. described multiple boys in her Chemistry class harassing her and making sexual jokes about her;

> C.T. reported that she told her counselor that she had conflict with a friend from church, talked about it with an adult with whom she felt safe, and resolved the issue with her friend;
>
> C.T. described feeling uncomfortable in one of her classes where there were a lot of boys in the class but said the boys were not doing anything wrong; and
>
> C.T. testified that there was a kind man at her church with special needs who hugged her a lot and who ripped off her mask once, that she discussed the issue with Mother, and that Mother helped her set boundaries with the man.

After this exchange, Tharp requested to be allowed to question the witnesses and present other evidence concerning these topics, but the trial court denied the request.

Later, following C.T.'s counselor's testifying in front of the jury, Tharp made another offer of proof by questioning the counselor outside the presence of the jury. The counselor explained that C.T. told her that her sisters and Mother verbally and physically abused her because of Tharp's abuse of them, that C.T. described a boy trying to choke her, that an adult with special needs from her church had a pattern of getting too close to her, and that C.T. reported multiple issues with boys, including unwanted sexual touching. After questioning the counselor, Tharp again requested that he be allowed to cross-examine witnesses about these topics, but the trial court denied the request.

During his case-in-chief, Tharp made another offer of proof concerning an investigator with the Department. Although the investigator did not testify, Tharp asserted that the investigator would testify regarding the allegation C.T. made against her teacher. Specifically, Tharp explained that the investigator would testify that C.T. claimed that the teacher would stare at her "boobs and butt," would get uncomfortably close to her, and looked down at his groin in class while his leg was on a chair and said to C.T. "You know you want it" in front of the class. Next, Tharp related that the investigator talked with two of C.T.'s friends

who were present in the class at the time of the alleged incident, that one friend agreed that the teacher stared inappropriately at C.T. and other girls, that the friend did not hear the comment C.T. related, and that the other friend was unaware of any inappropriate staring by the teacher or inappropriate comments being made. Moreover, Tharp stated that the investigator interviewed the teacher, that the teacher denied any misconduct, that the teacher explained that he talked with C.T. because she sat near his desk, that the teacher recalled that C.T. was removed from his classroom because of the allegation, and that the investigator ruled out any finding of improper behavior.

Building on the preceding, Tharp notes that his defensive theories at trial were that C.T. made up the allegations against him because she had a motive to harm him due to her anger with him for hurting their family, because she had a self-interested need to protect herself and get out of her false claim that she made to her friend, and because Mother coached her into believing that Tharp was a bad person. Next, Tharp asserts that the evidence of the "other false, unsupported, and incredible claims of sexual assault, inappropriate touching[,] and wrongful conduct" would have made her claims against Tharp "considerably less probable" and was necessary to rebut the State's "mischaracterization" of C.T. as "an honest and strong teen girl with no reason to lie." Further, Tharp argues that C.T. "had a *modus operandi* in that whenever she did not like someone, she would accuse that person of wrongful touching, bad sexual intention, or other wrongful conduct against her" and receive positive attention and that, consistent with that practice, she made up the claims against him because she wanted to get rid of her relationship with him and obtain acceptance from her new friends. Moreover, Tharp suggests that C.T.'s credibility "was the central dispositive issue" and that the State was not

16

similarly limited in its ability to present evidence as shown by the State's evidence regarding other allegedly improper behavior that he engaged in with C.T.'s siblings.

Although Tharp acknowledges that he was able to present evidence regarding the claim that C.T. made to her friend that resulted in Detective Stuart's involvement, he contends that he was not able to fully question C.T. about her telling her friend that she had been sexually assaulted by the stranger. Similarly, Tharp contends that the trial court's ruling prohibited him from presenting evidence that C.T. made claims against her teacher, other family members, and multiple boys and men that she met through school or her church. Tharp contends this evidence was relevant to C.T.'s truthfulness and credibility and would have established her "motive and self-interest to falsely accuse" Tharp. Regarding these claims, Tharp urges that the trial court's ruling denied him the ability to present a complete defense in violation of his due-process right to a fair trial and his right to confront the witnesses against him and was contrary to Rules of Evidence 404(b) and 412. *See* U.S. Const. amends. V, VI, XIV; Tex. Const. art. I, §§ 10, 19; Tex. R. Evid. 404(b), 412.

*Rules of Evidence*

In addressing this issue, we first consider whether the trial court's ruling was contrary to the Rules of Evidence. *See Hammer v. State*, 296 S.W.3d 555, 566 (Tex. Crim. App. 2009) (noting that courts need not address constitutional claim regarding admissibility of evidence unless they first determine evidence was barred by Rules of Evidence). Appellate courts review a trial court's evidentiary ruling for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside "the zone of

reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling considering the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

In his brief, Tharp references Rule 412, which governs the admission of evidence of a victim's past sexual behavior, but that Rule does not apply to trials in which the defendant is accused of indecency with a child. *See* Tex. R. Evid. 412; *see also Esparza v. State*, 513 S.W.3d 643, 646 n.3 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Rule 412, on its face, does not apply to a case of indecency with a child."). Because Rule 412 does not apply, we must review the admissibility of evidence of the allegations at issue under other Rules of Evidence. *See Thomas v. State*, 137 S.W.3d 792, 795 (Tex. App.—Waco 2004, no pet.). Under Rule 402, relevant evidence is admissible unless provided otherwise by the Texas or federal constitutions, a statute, the Rules of Evidence, or other rules prescribed under statutory authority. Tex. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *Id.* R. 401. Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* R. 403.

In general, "a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character

for truthfulness." *Id.* R. 608. "The increased emotional level associated with sexual offenses is all the more reason to refuse to allow the jury to be additionally confused by collateral acts of misconduct by a witness. Indeed, that is the entire purpose behind Rule 608(b)." *Lopez v. State*, 18 S.W.3d 220, 224 (Tex. Crim. App. 2000). "[T]he mere fact that an alleged" victim of a sexually-related offense "made prior false allegations does not automatically mean that she is fabricating the present charge." *Id.* at 225 (quoting *State v. Boggs*, 588 N.E.2d 813, 817 (Ohio 1992)). "Prior false allegations of abuse 'do not tend to prove or disprove any of the elements of'" indecency with a child. *See id.* (quoting *Boggs*, 588 N.E.2d at 817). Additionally, evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

The trial court could have reasonably concluded that evidence concerning the other allegations was not admissible under Rule 608 because the evidence would have been "extrinsic evidence to prove specific instances of the witness's conduct in order to attack . . . the witness's character for truthfulness." Tex. R. Evid. 608(b). To the extent that Tharp suggests that the evidence could have been admitted under the Rules of Evidence for another purpose such as establishing C.T.'s motive to lie about Tharp and showing her alleged history of making false accusations for personal gain, we similarly conclude that the trial court did not abuse its discretion by excluding that evidence.

As an initial matter, we note that the trial court did allow Tharp to present evidence regarding the sexual-assault allegation that C.T. made to her friend that resulted in

19

Detective Stuart's becoming involved in the case and, thereby, present his defense that C.T. had made a prior claim that was not fully truthful and that she subsequently made the claims against him to deflect from having told her friend an allegation that had not just occurred as she claimed it had. Regarding the allegations that were not discussed before the jury, none of the evidence described in the offers of proof would have established that C.T. had a motive to make false allegations against Tharp, that Mother had coached her to make a false claim against him, or that she made a false claim against him to deflect from the fact that she had made a disclosure to her friend. *See id.* R. 401, 404(b). Unlike other evidence presented at trial, this evidence would not have established that C.T. was angry at Tharp or otherwise had a grudge against him that might motivate her to make a false accusation against *him*. Similarly, although Tharp suggested that C.T. had a motive to make a false claim to fit in with her new friend group, nothing in the proffered evidence indicated that C.T. made any of the other allegations for the purpose of finding acceptance with that group. Similarly, C.T. testified at trial that she did not disclose to her friends the abuse by Tharp.

Moreover, the offers of proof did not establish that C.T. had a history of making allegations for personal gain or to punish individuals. In fact, the offers mentioned no benefit to C.T. with the possible exception of being removed from her teacher's classroom. However, the offer of proof regarding the teacher did not demonstrate that C.T. had previously been angry with the teacher or wanted out of his class before she made the allegation, and C.T. admitted during one of the offers of proof that she knew that the teacher suffered no consequence from her making the claim, undermining the idea that she had been making allegations for personal gain or to punish people she did not like. Similarly, C.T. stated during one of the proffers that she knew that the claims against her stepsister had not been investigated, which again undermines

20

the idea that C.T. had learned to make allegations as a way to punish people. The proffers regarding the remaining allegations did not indicate that C.T. was displeased or angry with any of the people against whom she made allegations.

Additionally, the proffered evidence regarding all the other allegations does not establish that the conduct described in the other allegations was similar to the abuse by Tharp. At trial, evidence was presented showing that Tharp caused his daughter C.T. to touch and rub his erect penis several times when she was nine years old or younger. However, the proffers for the other incidents concerned things that occurred when C.T. was older. In addition, the incidents involving sexual contact, inappropriate staring, or sexual discussions involved individuals with whom C.T. did not have a familial relationship, except for the allegations concerning her stepsister who was younger than C.T. Regarding the allegations against Mother and C.T.'s sisters, those allegations involved physical and verbal abuse, not sexual abuse. Absent similarity to the charged offense, no logical connection with those other instances exists that would reveal a motive by C.T. to lie about the claims against Tharp or establish a history of making false sexual-abuse allegations. *See Lopez*, 18 S.W.3d at 226; *Woods v. State*, 301 S.W.3d 327, 335 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("There is no evidence that the prior assault was similar or related to the instant crime warranting admissibility"); *see also Luevano v. State*, No. 08-10-00154-CR, 2012 WL 1883115, at *10 (Tex. App.—El Paso May 23, 2012, pet. ref'd) (op., not designated for publication) (noting that evidence would not establish modus operandi resulting in false claim against defendant, who was stranger to claimant, "where the accusations were made against family members and not strangers"). For these reasons, the trial court could have reasonably concluded that the evidence was not admissible under one of the permitted uses in Rule 404(b) or was not relevant under Rule 401.

21

*See* Tex. R. Evid. 401, 404(b); *see also Barrios v. State*, No. 13-22-00613-CR, 2024 WL 379521, at \*6 (Tex. App.—Corpus Christi-Edinburg Feb. 1, 2024, no pet.) (mem. op., not designated for publication) (concluding that evidence of prior allegations against individuals other than defendant was not relevant).

Tharp also contends that the evidence of the prior allegations should have been admitted under the doctrine of chances. That doctrine provides "that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them." *Plante v. State*, 692 S.W.2d 487, 492 (Tex. Crim. App. 1985) (quoting Wigmore, Evidence, § 302 (Chadbourn rev. ed. 1979)). To apply, "it is at least necessary the prior acts should be *similar*" for the various instances to have "probative value." *Id.* at 491-92 (quoting Wigmore, Evidence, § 302 (Chadbourn rev. ed. 1979)). As discussed above, the other allegations involve different types of abuse and involve different types of perpetrators. Accordingly, the trial court did not abuse its discretion by determining that evidence was not admissible under the doctrine of chances.

Alternatively, the trial court could have reasonably concluded that even if the evidence were minimally relevant and admissible under one of the Rules discussed above, it should be excluded under Rule 403. *See* Tex. R. Evid. 403. With the possible exceptions of the allegation against her teacher, the allegation that resulted in Detective Stuart's involvement, and the allegation that Mother and C.T.'s older sisters had been physically or verbally abusive toward her, no information was presented to the trial court that had any bearing on the truth or falsity of the allegations. Regarding the claim against the teacher, although Tharp stated that the teacher denied the allegations and had not been disciplined and although Tharp relayed

22

that a Department investigator had talked with one of C.T.'s friends who conveyed that she did not remember the incident occurring in class, Tharp also admitted that the investigator interviewed another one of C.T.'s friends who confirmed portions of C.T.'s allegations. Given this conflict, the trial court could have reasonably concluded that the allegation had not been shown to be false.

Concerning the sexual-assault allegation made to C.T.'s friend that prompted Detective Stuart's involvement, the trial court allowed Tharp to question Detective Stuart, C.T., and Mother about that allegation and about how C.T. was not fully honest when discussing the incident. Further, in her testimony, Detective Stuart explained that the allegation relayed by the friend involved sexual assault and that C.T. did not mention sexual assault when discussing the incident that had occurred earlier. To the extent that Tharp is suggesting on appeal that he wanted to question C.T. more thoroughly regarding the nature of the allegation, the trial court could have reasonably concluded that this allegation, like the others, had not been shown to be false. Although the three witnesses related that C.T. told a story to her friend that had not happened on the day she suggested because she did not want to talk about the abuse by Tharp, all three witnesses consistently explained that the incident had occurred but just on a different day. Moreover, during one of the proffers, C.T. clarified that she did not tell her friend that a man grabbed her and raped her and instead stated that a man grabbed her on the way home from school but that she was able to get away, and C.T. reiterated that the incident was true. Similar to the allegation above, the trial court could have reasonably concluded that the admission of additional evidence concerning this allegation was not warranted because the allegation had not been shown to be false.

Turning to the allegation that Mother and C.T.'s sisters engaged in verbally and physically abusive conduct towards C.T., we note that C.T.'s counselor testified outside the presence of the jury about the claim in a manner that was consistent with how C.T. described it during an offer of proof. Similarly, although Mother denied that it was verbal or physical abuse, she admitted during the trial that she had spanked C.T., kicked her, may have slapped her on the face, talked down to her, demeaned her, and treated her poorly when Mother was in a bad mood. Even though C.T.'s sisters denied engaging in abusive conduct toward C.T., Mother admitted that it could have happened. In light of this, the trial court could have reasonably concluded that the claims of physical and verbal abuse had not been shown to be false.

Because the trial court could have reasonably concluded that none of the allegations had been shown to be false and involved claims that were dissimilar to the offense for which Tharp was charged and given the number of other allegations involved, the time it would have taken to develop those allegations, the witnesses that might have been called in response to the testimony, and the low probative value of the evidence, the trial court could have reasonably concluded that even if the evidence was relevant or otherwise admissible, the probative value was substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, [or] undue delay." *See id.*; *see also Sosa v. State*, No. 03-07-00514-CR, 2010 WL 2330304, at *4 (Tex. App.—Austin June 10, 2010, no pet.) (mem. op., not designated for publication) (determining that unfair prejudice stemming from evidence of other allegations greatly outweighed any probative value where no evidence showed prior allegations were false).

For these reasons, we conclude that the trial court did not abuse its discretion by determining that the evidence was not admissible under the Rules of Evidence. *See* Tex. R. Evid. 401, 403, 404(b), 608(b).[2]

*Confrontation Rights*

In his brief, Tharp also argues that the trial court's limitation of his cross-examination concerning the other allegations violated his confrontation rights. Although Tharp mentions both the federal and the Texas constitutional provisions pertaining to confrontation rights, he does not argue that Texas provides any greater protection than the Sixth Amendment, and we will therefore address the issue "under established federal guidelines as applied by Texas courts." *See Murdock v. State*, 840 S.W.2d 558, 564 (Tex. App.—Texarkana 1992) (determining that Texas constitution affords no greater right to confrontation than Sixth Amendment), *vacated on other grounds*, 845 S.W.2d 915 (Tex. Crim. App. 1993).

---

[2] In this issue, Tharp relies on two cases by the Court of Criminal Appeals, but we find both of those cases to be distinguishable because they involved circumstances in which evidence of other allegations was excluded even though evidence showed the complainants had either made false claims of sexual abuse or threatened to do so. *See Hammer v. State*, 296 S.W.3d 555, 567, 569 (Tex. Crim. App. 2009) (determining in case in which daughter accused father of sexually abusing her that trial court should have admitted, among other things, evidence that daughter was angry at defendant for making her submit to sexual-assault examination, that daughter told nurse that man she ran away with had sexually assaulted her, that daughter later said that she actually had consensual sex with her boyfriend that night and not the man she accused and lied about it because her father was strict when it came to her relationship with her boyfriend, that daughter was hospitalized after threatening to commit suicide due to trauma of incident, and that she made claim against her father one month after being released from hospital); *Billodeau v. State*, 277 S.W.3d 34, 35, 40, 42, 43 (Tex. Crim. App. 2009) (concluding in case in which defendant was accused of sexually assaulting complainant that defendant should have been allowed to question complainant about complainant's threats to falsely accuse his neighbors of molesting him when neighbors angered him because claims against defendant and neighbors all involved same allegations of molestation being made against individuals who angered claimant).

The Sixth Amendment guarantees the right to confront witnesses, which includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying. U.S. Const. amend. VI; *see Davis v. Alaska*, 415 U.S. 308, 316 (1974). "[T]he right of cross-examination by the accused of a testifying State's witness includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility." *Virts v. State*, 739 S.W.2d 25, 29 (Tex. Crim. App. 1987); *see Johnson v. State*, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016). But "the right to cross-examine is not unqualified," and "[t]rial judges retain 'wide latitude' under the Confrontation Clause to impose restrictions on cross-examination based on such criteria as 'harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.'" *Johnson*, 490 S.W.3d at 909-10 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see Hammer*, 296 S.W.3d at 561; *Lopez*, 18 S.W.3d at 222.

Given this wide latitude, appellate courts review a claim alleging a violation of the right to confront a witness for an abuse of discretion. *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997). Most questions concerning cross-examination may be resolved by looking to the Rules of Evidence because the right to present evidence and cross-examine witnesses under the Sixth Amendment generally does not conflict with the corresponding rights under state evidentiary rules. *Hammer*, 296 S.W.3d at 561. In the rare event of a conflict, the Confrontation Clause prevails. *Id.*; *see* Tex. R. Evid. 101(d). "[T]he constitution is offended if the state evidentiary rule would prohibit [a defendant] from cross-examining a witness

26

concerning possible motives, bias, and prejudice to such an extent that he could not present a vital defensive theory." *Hammer*, 296 S.W.3d at 562-63.

The Court of Criminal Appeals has held that while there is no per se exception for admitting certain kinds of evidence in trials of sexual offenses, the Confrontation Clause occasionally may require the admissibility of evidence that the Rules of Evidence would exclude. *See Lopez*, 18 S.W.3d at 225; *see Thomas v. State*, 669 S.W.2d 420, 423 (Tex. App.—Houston [1st Dist.] 1984, pet. ref'd) (determining that defendant's confrontation rights were violated where he was not allowed to question complainant about prior accusation of sexual abuse that was shown to be false). Thus, it is necessary to balance the probative value of the evidence sought to be introduced against the risk that its admission may entail. *See Lopez*, 18 S.W.3d at 222. Where a prior allegation of abuse was not shown to be false and where it is not similar to the charged offense, the probative value of evidence pertaining to a prior allegation is outweighed by the risk that it would be unduly prejudicial and confuse the jury. *Id.* at 226.

As set out above, with the exception of the allegations resulting in Detective Stuart's involvement, the allegation of verbal and physical abuse by Mother and C.T.'s sisters, and the allegation against C.T.'s teacher, no evidence was proffered regarding the truthfulness of the other allegations. However, even for the three allegations for which some evidence was proffered, the trial court could have reasonably concluded that those allegations had not been shown to be false. Moreover, as discussed previously, the prior allegations involved different conduct and different types of offenders, and nothing in the proffered evidence indicated that C.T. was motivated to make those prior allegations out of anger. Accordingly, as set out above, the trial court reasonably could have determined that the probative value of the prior allegations was minimal and that the admission of the evidence would have been unduly prejudicial, would

have required a significant amount of time to develop, and carried the additional substantial risk of confusing the jury. *See id.*

To the extent that Tharp is arguing that the trial court prohibited him from questioning C.T. about the details and nature of the claim that she made to her friend, the trial court could have reasonably determined that it was appropriate to allow Tharp to question C.T. and other witnesses concerning the claim that resulted in Detective Stuart's initial involvement to provide context for her involvement and show how C.T. pivoted to an accusation against Tharp but also reasonably could have determined that limiting the amount and type of the evidence pertaining to that allegation was appropriate where the allegation had not been shown to be false in the sense that it did not occur. *See Johnson*, 490 S.W.3d at 909-10 (noting trial court's great latitude for limiting cross-examination). Additionally, Tharp was allowed to question C.T. about whether she lied to her friend and to question Detective Stuart about the nature of the allegation and about C.T. not being fully truthful. Further, unlike *Johnson*, which is one of the cases on which Tharp primarily relies, nothing in the proffered evidence for the allegations other than the one resulting in Detective Stuart's involvement indicates that C.T. was motivated to make an allegation against Tharp to deflect from something she had done or to gain sympathy. *See id.* at 911, 912 (noting that trial court excluded evidence that minor complainant had been sexually abusing his younger sister and had been placed in therapy for that by his parents before he made claim that defendant had molested him and concluding that evidence was admissible under Confrontation Clause because it was relevant to issue of whether complainant "had a motive to falsely accuse Johnson of sexual assault" by seeking "to deflect negative attention away from him and to gain sympathy from his parents").

Moreover, Tharp was still able to present his defensive theories by cross-examining witnesses regarding how C.T. provided inaccurate information to her friend and then accused Tharp of indecency when the police got involved, including C.T.'s testimony that the case took off on its own, and regarding how C.T., Mother, and C.T.'s sisters were angry with Tharp for breaking up the family. *See Hammer*, 296 S.W.3d at 562-63; *see also id.* at 569 (noting that there were constitutional implications from "exclusion of *all* of appellant's evidence offered to demonstrate P.H.'s motive to testify against appellant" (emphasis added)); *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002) (observing that evidentiary rulings rarely rise to level of denying constitutional right to present meaningful defense). Further, Tharp was able to support his defensive theory attacking C.T.'s credibility through C.T.'s teacher's testimony and through cross-examining witnesses concerning the details, timing, and consistency of the disclosures made to Mother and C.T.'s counselor and of C.T.'s testimony.

In light of the preceding, we cannot conclude that the trial court abused its discretion by limiting Tharp's cross-examination or that the limitation violated the Confrontation Clause.

*Due Process*

In this issue, Tharp also mentions that the trial court's rulings violated his due-process rights. However, Tharp does not set out any argument specific to this assertion that differs from those made concerning the Rules of Evidence and the Confrontation Clause. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity

29

to present a complete defense" (internal citations and quotation marks omitted)).  For the reasons set out above, we similarly conclude that the trial court's ruling did not violate Tharp's due-process rights.  *See Stringer v. State*, 309 S.W.3d 42, 46 (Tex. Crim. App. 2010) (noting that some claims can be presented as due-process ones or as violations of Confrontation Clause); *Stringer v. State*, 276 S.W.3d 95, 107 (Tex. App.—Fort Worth 2008) (Dauphinot, J., dissenting) (recognizing overlapping due-process and confrontation concerns present in right of confrontation and cross-examination), *aff'd*, 309 S.W.3d 42 (Tex. Crim. App. 2010).

For all the reasons previously given, we overrule Tharp's first issue on appeal.

## Detective Stuart's Testimony

In his second issue on appeal, Tharp argues that the trial court erred by allowing Detective Stuart to "vouch for" C.T.'s veracity.  In particular, Tharp points to the following exchange at trial:

> [State]: Detective, let me -- Was there a frog in her throat or tears in her eyes when she told you that what she told her friend wasn't true?
>
> [Detective Stuart]: No.
>
> [State]: How great is she in your -- in this one experience here at maintaining a lie?
>
> [Detective Stuart]: From my experience with [C.T.], I don't think she would be able to maintain a lie.
>
> [Tharp]: Objection to vouching and nonresponsive.
>
> . . . .
>
> [Trial court]: Overruled.

In light of this exchange, Tharp contends that Detective Stuart's testimony was improper because it "was a direct opinion on the truthfulness of the complainant" and that, therefore, the trial court erred in overruling his objection to her testimony.

As with the previous issue, we review the trial court's ruling for an abuse of discretion. *See Tillman*, 354 S.W.3d at 435. On appeal, Tharp suggests that Detective Stuart was an expert rather than a lay witness. *See* Tex. R. Evid. 701-02 (governing testimony by lay and expert witnesses). However, regardless of whether Detective Stuart was testifying to her opinion as a lay witness or as an expert, *see Canada v. State*, 547 S.W.3d 4, 16 (Tex. App.—Austin 2017, no pet.) (explaining that "[w]hen a witness who is capable of being qualified as an expert testifies regarding events which he or she personally perceived, the evidence may be admissible as both Rule 701 opinion testimony and Rule 702 expert testimony" (quoting *Osbourn v. State*, 92 S.W.3d 531, 536 (Tex. Crim. App. 2002))), the trial court abused its discretion by overruling Tharp's objection.

Neither expert witnesses nor lay witnesses may testify to the truthfulness of a witness's testimony. *See Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997); *Yount v. State*, 872 S.W.2d 706, 711 (Tex. Crim. App. 1993); *Pavlacka v. State*, 892 S.W.2d 897, 902 n.6 (Tex. Crim. App. 1994); *Fuller v. State*, 224 S.W.3d 823, 833 (Tex. App.—Texarkana 2007, no pet.); *see also Yount*, 872 S.W.2d at 710, 711 (noting that experts on child abuse are not human lie detectors and, accordingly, may not testify that particular witness is truthful). By expressing her opinion that C.T. was not fabricating her allegations, Detective Stuart provided an inadmissible opinion as to C.T.'s truthfulness. *See Sandoval v. State*, 409 S.W.3d 259, 292 (Tex. App.—Austin 2013, no pet.).

31

The State argues that this otherwise inadmissible testimony was proper because Tharp opened the door to this testimony through its cross-examination of Detective Stuart and created a false impression regarding C.T.'s truthfulness through that questioning. We disagree. As support for this argument, the State cites cases where the defense created a false impression through witness testimony and where the State was then allowed to introduce evidence to rebut that false impression. *See, e.g.*, *Kipp v. State*, 876 S.W.2d 330, 335-36 (Tex. Crim. App. 1994) (determining that introduction of defense expert testimony that child was coached opened door to testimony that child was not coached); *Moore v. State*, 82 S.W.3d 399, 407 (Tex. App.—Austin 2002, pet. ref'd) (determining that because defendant created false impression about whether one of twenty videotapes contained pornographic images, State could ask follow-up question to correct impression), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571 (Tex. Crim. App. 2008). In contrast here, there was nothing from the State's side that needed correcting. Detective Stuart testified during cross that she did not believe that C.T. fabricated the allegations. Accordingly, the State's subsequent questioning of Detective Stuart just elicited additional evidence that C.T. was truthful through Detective Stuart's testimony that she did not believe C.T. could maintain a lie.

For these reasons, the trial court abused its discretion by overruling Tharp's objection to Detective Stuart's testimony. *See Sandoval*, 409 S.W.3d at 292.

In light of the preceding, we must now determine whether Tharp was harmed by the ruling. The erroneous admission of testimony is non-constitutional error. *See Jessop v. State*, 368 S.W.3d 653, 678 (Tex. App.—Austin 2012, no pet.). Because the error is non-constitutional, it must be disregarded unless it affected Tharp's substantial rights. *See* Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious

32

effect or influence in determining the jury's verdict. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Moreover, "[i]t is well settled that the erroneous admission of testimony is not cause for reversal 'if the same fact is proven by other testimony not objected to.'" *Smith v. State*, 499 S.W.3d 1, 6 (Tex. Crim. App. 2016) (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)). In other words, error in the improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point in the trial. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010). This is true regardless of whether the other testimony "was received . . . before or after the complained-of-ruling." *Coble*, 330 S.W.3d at 282 (quoting *Leday*, 983 S.W.2d at 718).

When asserting that he was harmed in his brief, Tharp relies on factors that courts have considered when assessing harm from the erroneous admission of expert testimony. When assessing harm from the erroneous admission of expert testimony, courts may consider the following:

> (1) the strength of the evidence of the appellant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during arguments.

*Sandoval*, 409 S.W.3d at 293-94. For purposes of resolving this issue on appeal, we will consider the additional factors.

*Strength of the Evidence*

In his brief, Tharp contends that the first factor weighs in favor of harm because evidence of his guilt was not overwhelming. Specifically, Tharp insists that "there was absolutely no physical or objective evidence showing" that Tharp committed the charged

offense. Further, Tharp asserts that all the evidence presented originated with C.T.'s claims and that her credibility "was the paramount issue at trial."

As suggested by Tharp, no DNA evidence, surveillance footage of the abuse, or any other similar type of evidence linking him to the offense in question was presented, and no one other than C.T. testified to observing Tharp commit the charged offense. *See Hammer*, 296 S.W.3d at 561-62 ("Sexual assault cases are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence."). However, even though C.T. later described and testified about incidents beyond those initially disclosed, C.T. testified that Tharp made her touch his penis with her hand while in the shower, and Mother similarly testified that C.T.'s outcry concerned this behavior. Those allegations served as the basis for the charge. Further, although C.T. admitted to not being truthful with her friend when disclosing an allegation that resulted in Detective Stuart's involvement, Detective Stuart testified that C.T. readily admitted why she was not fully truthful with her friend about the incident and that C.T. explained why she told her friend about a prior incident rather than disclose Tharp's abuse of her.

Moreover, multiple witnesses confirmed that Tharp showered with C.T. and often had very little clothing on in front of C.T. and the other children. Additionally, Oldest Sister testified that when she was eleven years old, Tharp showed her a pornographic magazine containing "very graphic" sexual images. Further, Older Sister described Tharp's giving her a "strange" back massage that resulted in him touching near her chest while he was wearing shorts but no shirt. Additionally, although several witnesses testified regarding the children's and Mother's being angry at Tharp for the divorce, other evidence at trial demonstrated that the

34

divorce had occurred years earlier, that Tharp and Mother were on friendly terms at the time of the outcry, and that there had been no dispute between Tharp and C.T. leading up to the outcry.

Although the evidence may not have been overwhelming, the jury could consider evidence beyond C.T.'s description of the events when determining Tharp's guilt.

*Similar Evidence*

Detective Stuart provided the objected-to testimony at issue during the State's redirect. However, during Tharp's prior cross-examination, Detective Stuart provided the following similar testimony:

> [Tharp]: But it occurred to you during that conversation, did it not, that she could be saying something false against her father?
>
> [Detective Stuart]: At no point did I believe what she was saying against her father was false.
>
> . . . .
>
> [Tharp]: But you in this instance did question what she had to say. You told her, "Are you in a fight with your dad or something?"
>
> [Detective Stuart]: I did ask her if anything was going on between her and her dad, yes.
>
> [Tharp]: Okay. And she said no?
>
> [Detective Stuart]: Correct.
>
> [Tharp]: That's not a typical question that would be asked in a CAC interview, is it?
>
> [Detective Stuart]: No.
>
> . . . .
>
> [Tharp]: But you would agree that in this circumstance the reason it deviates is because the new allegation was suspicious, right?
>
> [Detective Stuart]: No. It was not suspicious to me.

35

Although Detective Stuart explained during the State's redirect that she believed C.T. would have a difficult time telling a lie, the statements above had a more direct bearing on C.T.'s truthfulness because Detective Stuart testified that she believed C.T. was telling the truth and did not find the allegations to be suspicious. *See Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection"). The fact that the jury heard similar unobjected-to testimony "mitigates the harm." *See Sandoval*, 409 S.W.3d at 294.

Accordingly, this factor strongly weighs in favor of a determination that Tharp was not harmed. *See Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) (determining that admission of inadmissible evidence was rendered harmless by admission of other evidence proving same fact inadmissible evidence sought to prove); *Lopez v. State*, 288 S.W.3d 148, 155, 156 (Tex. App.—Corpus Christi-Edinburg 2009, pet. ref'd) (determining that trial court erred by overruling objection to witness's testimony regarding child victim's truthfulness but concluding that any error was harmless because same witness "expressed an opinion" later during his testimony "on [victim]'s truthfulness").

*Strength of the Conclusion*

In his brief, Tharp contends that Detective Stuart's assessment of C.T.'s truthfulness was strong because it was given the trial court's seal of approval when it overruled his objection to the inadmissible evidence. However, our review of the record leads us to conclude that the opinion expressed in the objected-to testimony was not particularly powerful. *See Sandoval*, 409 S.W.3d at 295. Instead, Detective Stuart simply opined that she did not "think" C.T. "would be able to maintain a lie" and provided no definitive assessment of C.T.'s

36

truthfulness in that exchange. *See Coble*, 330 S.W.3d at 286 (explaining that expert's testimony that "there is a probability that" "was not particularly powerful, certain, or strong").

Accordingly, this factor does not weigh in favor of a finding of harm.

*State's Arguments*

On appeal, Tharp suggests that this factor weighs in favor of harm because, following the overruling of his objection, the State referenced Detective Stuart's improper testimony during its closing argument. Although the State did reference portions of Detective Stuart's testimony during its closing argument, it referenced statements made in her cross-examination that were not objected to and did not reference the testimony at issue regarding whether C.T. could maintain a lie. Specifically, the State argued as follows:

> She said the same thing to . . . [Detective] Stuart, who, by the way, has investigated hundreds of these kinds of cases and, on cross examination, said she didn't doubt for one second that what [C.T.] said about what Jim Tharp did to her was true.

Moreover, besides making this brief reference to Detective Stuart, the State only mentioned Detective Stuart one other time during its closing when it mentioned that Detective Stuart testified that C.T. did not tell her friend the truth. *See id.* at 287 (noting that State's argument did not weigh in favor of harm where State "barely mentioned" witness during closing and did not emphasize his opinions). Accordingly, this factor does not weigh in favor of harm.

Given these particular circumstances, particularly the existence of unobjected-to testimony from Detective Stuart more directly commenting on C.T.'s truthfulness concerning the allegations, we conclude that the error in overruling Tharp's objection did not have a substantial

and injurious effect on the jury's deliberations. *See Sandoval*, 409 S.W.3d at 295. For these reasons, we overrule Tharp's second issue on appeal.

**Court Costs**

In his third issue on appeal, Tharp contends that the trial court erred when it assessed court costs. Specifically, Tharp notes that the certified bill of costs states that he was obligated to pay a $5 "Additional Monthly Fine for Sex Offenders" but emphasizes that the trial court specified during sentencing that "[t]here is no fine . . . ordered to be paid." Additionally, although Tharp acknowledges that the Code of Criminal Procedure authorizes the imposition of a monthly $5 fee for people convicted of indecency with a child or of other sexual offenses, he contends that the fee can only be applied to individuals placed on community supervision, which did not occur in this case. *See* Tex. Code Crim. Proc. art. 42A.653. Further, although the trial court's judgment stated that the costs would be included in an attached bill of costs, Tharp observes that the judgment did not itemize the costs and that the bill of costs was not produced until two months after he was sentenced. Accordingly, Tharp argues that he was unable to object to the improper imposition of court costs and that this issue may be considered for the first time on appeal. In its appellee's brief, the State agrees that the fee was improperly imposed and should be removed but clarifies that it does not agree that the trial court actually erred because the court costs were prepared by the trial court clerk, because nothing in the record indicates that the trial court was aware of the fee, and because Tharp did not file a motion with the trial court seeking to have the fee removed. *See id.* art. 103.008.

Under the Code of Criminal Procedure, a convicted defendant is obligated to pay court costs. *See id.* art. 42.16. "Court costs listed in a certified bill of costs need neither be

38

orally pronounced nor incorporated by reference in the judgment to be effective." *Johnson v. State*, 423 S.W.3d 385, 389 (Tex. Crim. App. 2014). However, only statutorily authorized costs can be assessed against a defendant. *See* Tex. Code Crim. Proc. art. 103.002; *Johnson*, 423 S.W.3d at 389. "[A] criminal defendant need not preserve an objection to the trial court to raise a claim challenging the basis for the imposition of court costs for the first time on appeal." *Johnson*, 423 S.W.3d at 390; *see id.* at 391 (explaining that defendant often does not have opportunity to object because court costs are not imposed in open court or because written judgment does not contain written amount of court costs); *see also Williams v. State*, 495 S.W.3d 583, 588 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) (describing how although article 103.008 provides method for challenging court costs by filing motion with trial court, "it is not the exclusive method").

As Tharp and the State agree, the Code of Criminal Procedure requires the imposition of a $5 monthly fee for individuals convicted of certain sexual offenses but only for individuals placed on community supervision. *See* Tex. Code Crim. Proc. art. 42A.653; *see also Van Flowers v. State*, 629 S.W.3d 707, 710 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (noting that appellate courts give due consideration to State's concession). Because Tharp was not placed on community supervision, the fee should not have been imposed in this case. Appellate courts have the authority to modify a trial court's judgment and affirm it as modified. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). This authority extends to removing unauthorized court costs. *Llorens v. State*, 520 S.W.3d 129, 143, 144 (Tex. App.—Austin 2017, pet. ref'd).

Accordingly, we sustain Tharp's third issue on appeal and modify the bill of costs and, in turn, the judgment to delete the $5 "Additional Monthly Fine for Sex Offenders." *See* Tex. R. App. P. 43.2(b); *Bigley*, 865 S.W.2d at 27-28.

## CONCLUSION

Having modified the trial court's judgment as set out above and having overruled Tharp's first two issues on appeal, we affirm the trial court's judgment of conviction as modified.

_____

Thomas J. Baker, Justice

Before Justices Baker, Triana, and Kelly

Modified and, As Modified, Affirmed

Filed:   May 22, 2024

Publish